**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CITIZENS COAL COUNCIL, | ) | |
| | ) | Civil Action No. 13 - 896 |
| Plaintiff, | ) | |
| | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| v. | ) | |
| | ) | ECF No. 59 |
| MATT CANESTRALE CONTRACTING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

LENIHAN, Chief M.J.

Currently pending before the Court for disposition is the Motion to Dismiss filed by Defendant, Matt Canestrale Contracting, Inc. ("MCC"), pursuant to Rule 12(b)(1) (ECF No. 59), challenging Plaintiff's standing to bring this lawsuit. For the reasons that follow, the Court will deny Defendant's motion to dismiss.

## I. LEGAL STANDARD – MOTION TO DISMISS UNDER RULE 12(b)(1)

MCC has moved to dismiss the Amended Complaint pursuant to Rule 12(b)(1) for lack of standing. "A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir.2007) (citations omitted). The standard applied by the Court in reviewing a 12(b)(1) motion depends on whether the motion presents a "facial" or a "factual" attack on the issue presented. *In re Schering Plough Corp.Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

In a facial attack, which is usually made before an answer is filed or the factual allegations of the complaint are otherwise contested, the moving party is arguing that the claim, on its face, is insufficient to invoke the subject matter jurisdiction of the court. *Constitution Party of Pa. v. Aichele,* ___ F.3d ___, 2014 WL 3294855, *7 (3d Cir. July 9, 2014). In other words, "a facial attack requires the district court to apply the same standard of review it would employ in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party." *Id*. (citing *In re Schering Plough Corp.*, 678 F.3d at 243). On the other hand, a factual attack argues "that there is no subject matter jurisdiction because the facts of the case—and here the District Court may look beyond the pleadings to ascertain the facts—do not support the asserted jurisdiction." *Id.* Thus, "a facial attack contests the sufficiency of the pleadings, whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." *Id*. (quoting *In re Schering Plough Corp.*, 678 F.3d at 243; *CNA v. United States*, 535 F.3d 132, 139 (3d Cir.2008)) (internal quotation marks omitted) (alterations in original). Although not specifically stated in its motion or supporting brief, MCC appears to be making a factual challenge, as the motion was filed after the close of discovery and is based on evidence beyond the Amended Complaint and the documents attached thereto.

As to who bears the burden of proof regarding standing, the court of appeals explained:

> On a motion to dismiss for lack of standing, the plaintiff "'bears the burden of establishing' the elements of standing, and 'each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 838 (3d Cir.1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351

> (1992)). However, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561.

*Ballentine*, 486 F.3d at 810.

## II. RELEVANT FACTUAL BACKGROUND & PROCEDURAL HISTORY[1]

This lawsuit arises out of MCC's efforts to reclaim the 360 acre, LaBelle coal refuse disposal site located in Luzerne Township, Fayette County, Pennsylvania (the "Site"), using coal combustion by-products ("CCBs") certified by the Pennsylvania Department of Environmental Resources ("DEP") for beneficial use. The reclamation is being done for the purpose of capping and otherwise stabilizing the Site to mitigate geotechnical instability (landslide) and to abate existing water pollution. MCC acquired the Site out of the LaBelle Processing, Inc. bankruptcy in 1997 under a Consent Order and Agreement approved by the bankruptcy court.

CCC, a Pennsylvania non-profit corporation, "is a national alliance of social and environmental justice grassroots groups and individuals" whose mission is "to protect communities affected by the mining, processing, and burning of coal through advocating enforcement and strengthening of environmental laws as it relates to coal." Bylaws of CCC, Art. II (eff. 9/11/07)[2] ("2007 Bylaws"), ECF No. 60-2 at 1. The purpose of CCC, as stated in the 2007 Bylaws, is to provide "a central organization and office for the sharing and dissemination

---

[1] Only those facts relevant to the standing issue are set forth here.

[2] At the time the present litigation was instituted, the 2007 Bylaws were in effect. On April 23, 2014, CCC adopted new Bylaws ("2014 Bylaws), which contain only one class of membership consisting of individual people only, and grant each member the right to vote. Def.'s Ex. 10, Art. 3.1 & 3.7, ECF No. 60-10 at 1-2. In addition, the governing body of CCC is now called the Board of Directors and is comprised of 13 persons who are chosen annually by the members at the annual meeting of the members. *Id.* at Art. 4.1 & 4.3, ECF No. 60-10 at 2-3. MCC argues that the 2014 Bylaws are irrelevant to CCC's standing to bring this lawsuit because standing is determined at the time the complaint is filed, citing *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) ("the jurisdiction of the Court depends upon the state of things at the time of the action brought.") (citations and internal quotation marks omitted). CCC concedes that the 2007 Bylaws apply for purposes of determining whether standing exists.

of relevant information to all member groups and individuals, . . . a coordinated voice for communication with legislatures and governmental agencies that regulate mining, processing and burning of coal," and "active assistance to new and existing community groups." 2007 Bylaws, Art. III.

The 2007 Bylaws set forth four categories of membership: (1) Member Organizations; (2) Associate Member Organizations; (3) Individual Members; and (4) Alliance Groups. *Id.*, Art. IV. Member Organizations are the primary membership category for CCC, and each organization is entitled to elect a qualified delegate to the Coordinating Committee of CCC. *Id.*, Art. IV, §IV.1. Associate Member Organizations are also entitled to elect a qualified delegate to serve on the Coordinating Committee. *Id.*, Art. IV, §IV.2. Individual Members do not have voting rights unless elected to an at-large position of the Coordinating Committee, but may serve on standing, ad hoc and issues committees. *Id.*, Art. IV, §IV.3. Alliance Groups also have no voting rights but may serve on issue committees. *Id.*, Art. IV, §IV.4.

CCC is governed by its board of directors, referred to the "Coordinating Committee" in its 2007 Bylaws. The Coordinating Committee is comprised of one qualified delegate elected by each of the Member Organizations and Associate Member Organizations of CCC and the five at-large delegates elected by the Coordinating Committee. *Id.*, Art. V & §V.1. Member Organizations and the Coordinating Committee may nominate individuals for the at-large positions on the Coordinating Committee. *Id.* at §V.5. The five at-large delegates are elected by a majority vote of the delegates on the Coordinating Committee in even-numbered years, and must have "qualifications and expertise deemed important to advance CCC's mission." *Id.*, Art. V, §§V.1 & V.5. None of the residents of LaBelle, PA, including the four Standing Witnesses,

has ever been elected to an at-large position on the Coordinating Committee. The delegates on the Coordinating Committee elect the officers of CCC by a majority vote. *Id.*, Art. VI, §VI.5.

Prior to filing this lawsuit, CCC sent a Notice of Intent to Sue Letter ("NOI") to the U.S. Environmental Protection Agency ("EPA") and the DEP on March 13, 2013. To establish standing for sending the NOI, CCC recruited, with the guidance of the Environmental Integrity Project ("EIP"), four citizens of Luzerne Township as standing witnesses who, for a one-time contribution of $10.00, became members of CCC: Gary Kuklish, Darrel "Pete" Redman, Lenora Byrd, and Yma Smith ("Standing Witnesses").

On June 26, 2013, CCC filed the instant lawsuit setting forth alleged violations of the Resource Conservation and Recovery Act ("RCRA") and various Pennsylvania state laws, predicating subject matter jurisdiction on 42 U.S.C. §6972(a)(1)(B), 42 U.S.C. §7604(a)(1) & (f)(4), and 28 U.S.C. §§1331 & 1367. (Am. Compl. ¶12.) In both its original and amended complaints, CCC alleges that drainage seeping from the Site at several locations is flowing to Pennsylvania waters without a permit, which has caused and continues to cause pollution in the four streams close to the Site. Am. Compl. at ¶¶7-8. It is further alleged that the pollution of surface waters caused by the Site exceeds levels at which scientific studies have found harm to aquatic life, and as such, may present an imminent and substantial endangerment to the environment in violation of the RCRA. *Id.* at ¶9.[3] Moreover, CCC alleges that twenty-six (26) of its members live or work within a mile of the Site, but refrain from hunting, fishing, or engaging in other recreation on and along the Monongahela River and its tributaries near the Site in the LaBelle area because of pollution from the Site. *Id.* at ¶18. CCC contends that these

[3] MCC denies the allegations in paragraphs 7 through 9 of the Amended Complaint. *See* Ans. to First Am. Compl., ¶¶7-9, ECF No. 55 at 3. However, those factual issues need not be resolved in order to rule on the motion to dismiss for lack of standing.

members are adversely affected by the ground and surface water discharges, fugitive dust emissions, and failure to comply with permit conditions. *Id.* at ¶19. Specifically, CCC alleges that its members used to hunt deer near the Site and fish in the Monongahela River close to where the polluted streams near the Site flow into the river, but no longer do so because they are concerned that the deer and fish are contaminated with pollution from the Site. *Id.* at ¶¶19-20. Some of CCC's members also used the streams near the Site for various other purposes, such as bait storage, but no longer do so because the streams are too polluted. *Id.* at ¶20. Two of the streams have a visible iron color, which the members find aesthetically displeasing. *Id.* In addition, CCC members have repeatedly experienced fugitive coal ash pollution on their homes, cars and other property from uncovered trucks hauling coal ash and have been exposed to more dust when driving state road 4022 where trucks cross from the terminal area to the Site. *Id.* at ¶21.

The parties have conducted discovery which ended on May 9, 2014. On May 28, 2014, MCC filed a motion to dismiss Plaintiff's Complaint based on lack of standing (ECF No. 59).[4] The Court heard oral argument on this motion on July 18, 2014. As the motion to dismiss for lack of standing has been fully briefed and argued, it is ripe for disposition.

## III. ANALYSIS

MCC argues that CCC has failed to establish associational standing, and therefore, this Court lacks subject matter jurisdiction over this action. "[A]n association has standing to bring

[4] Also pending before this Court is MCC's motion to dismiss (ECF No. 27) pursuant to Federal Rule of Civil Procedure 12(b)(1) filed on February 26, 2014. At the post-discovery status conference on May 29, 2014, the Court indicated it will treat that motion as either a motion to dismiss under Rule 12(b)(6) or motion for summary judgment, but would wait to rule on that motion until after it decided the motion to dismiss for lack of standing (ECF No. 59), as the motion filed at ECF No. 59 raises a jurisdictional issue that must be addressed first.

suit on behalf of its members when: (a) its members would otherwise have standing in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

MCC's challenge to CCC's standing is predicated on the membership requirement in the first prong of the associational standing test, specifically, on whether the Standing Witnesses can be considered members of CCC. To determine whether the Standing Witnesses are "members" of CCC, MCC argues that the Court must apply the *Hunt* "indicia of membership" test, which looks at whether the "members" have the ability to (1) elect the members of the governing body of the organization; (2) serve on the governing body; and (3) finance its activities, including the cost of litigation, through the levy of assessments. *Id.* at 344-45. When that test is applied, MCC argues that CCC cannot establish standing through its Standing Witnesses. None of them possesses the necessary indicia of membership in CCC since none have the right to vote, elect the governing body, serve on the board of directors (i.e., the Coordinating Committee), or otherwise controls the actions of the officers or delegates to the Coordinating Committee whom they did not elect.

In opposition to MCC's standing challenge, CCC advances a two-fold argument. First, CCC argues that where an organization has a formalized membership structure and allows its members to directly influence the course of litigation that is focused on their environmental concerns, as in the case at bar, this is the traditional setting for associational standing and the *Hunt* "indicia of membership" test does not apply. Second, even if the *Hunt* test did apply, CCC submits that all of the elements of that test would be met except for voting. CCC maintains,

nonetheless, that as recognized by the case law, member involvement at the local level is a more effective way of making an organization responsive to its members than periodic voting. Here, CCC submits that the intense local involvement would more than make up for the initial lack of voting rights. Moreover, CCC submits that the other relevant criteria in *Hunt*—eligibility for service on the governing board and financing the organization's activities—have been met here and thus support its standing to bring this lawsuit.

Both sides cite case law in support of their positions, but none of the cases cited is on all fours with the unique facts presented here. Moreover, in the context of environmental organizations, the courts have disagreed on how much control members must exert over an organization and the means by which they achieve that control. *Compare Basel Action Network v. Maritime Admin.*, 370 F.Supp. 2d 57, 70 (D.D.C. 2005) (rejecting associational standing asserted by plaintiff organization which gave no voting rights or right to control to injured individuals it sought to represent), *Friends of the Earth v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997) (organization could assert associational standing in the absence of legal members under applicable corporation law where members voluntarily associated with the organization and the lawsuit clearly fell within the organization's central purpose and the scope of reasons individuals joined the organization; the court explicitly assumed voting rights were a necessary element of indicia of membership, however, it did not examine too closely the relationship between voting rights and the standing witnesses in that case), and *Sierra Club v. Aluminum Co. of Am.* ("*ALCOA*"), 585 F.Supp. 842, 851 (N.D.N.Y. 1984) (voting rights are *sine qua non* element of associational standing, but lack of majority voting status, i.e., control, did not defeat standing), *with U.S. Public Interest Research Group v. Bayou Steel, Inc.* ("*Bayou Steel*"), Civ. A.

No. 96-0432, slip op. at 5 (E.D.La. Sept. 15, 1997)[5] (even though articles of incorporation provided that the organization shall have no members, court found the organization consistently treated all contributors as members, and despite a lack of voting rights, found associational standing existed as the organization provided its members with a means of expressing their collective views and protecting their collective interests in environmental issues), and *California Sportfishing Prot. Alliance v. Diablo Grande, Inc.*, 209 F.Supp. 2d 1059, 1066 (C.D. Cal. 2002) (concluding that because the plaintiff had brought suit on behalf of its associate members and defendant failed to present any evidence that plaintiff was not a traditional voluntary membership organization, the "indicia of membership" test was not applicable, thereby implying that as long as the organization is legally chartered as a membership organization, actual voting rights or control is not relevant to the associational standing inquiry). These cases illustrate that in this area, the decisions are fact specific, a definitive formal test has yet to be delineated, and most courts have heeded the warning in *Hunt* not to elevate form over substance. *See* Karl S. Coplan, *Is Voting Necessary? Organization Standing and Non-Voting Members of Environmental Advocacy Organizations* ("Coplan"), 14 SE. ENVTL. L. J. 47, 75 (Fall 2005) (noting that the constitutional requisite of "concrete adverseness" for Article III standing requires some measure of organizational responsiveness to the constituents who would be represented by the organization in court, but the minimum adequate means of accomplishing this responsiveness remains unclear).

Therefore, the question presented in MCC's motion to dismiss for lack of standing is not entirely governed by *Hunt* or any other precedent binding upon this Court. Unlike the growers'

[5] Plaintiff filed a copy of the slip opinion in *Bayou Steel* as an exhibit to its memorandum in opposition to MCC's motion to dismiss for lack of standing. *See* ECF No. 65.

association in *Hunt*, CCC is a voluntary membership organization, with formal bylaws establishing four categories of membership, two of which confer voting rights via the right to elect delegates to the Coordinating Committee.[6] The delegates on the Coordinating Committee, in turn, elect the officers of CCC. Thus, unlike the board of directors/trustees in *Health Research Group*, 82 F.R.D. at 24, and *Package Shop*, 1984 WL 6618, at *116, CCC's Coordinating Committee and officers are not self-appointed or self-perpetuating.[7] On the other hand, under the 2007 Bylaws, individual members, such as the Standing Witnesses, do not have voting rights unless elected to one of the five at-large positions on the Coordinating Committee. Thus, the question presented here is to what extent, if any, is CCC's associational standing affected by the fact that the individual members, on whose behalf this lawsuit is brought, are not at-large delegates to the Coordinating Committee and thus, lack voting rights under the 2007 Bylaws.

MCC argues that voting and control are essential to representational standing, and as the Standing Witnesses lack both, they are not true members, but merely contributors, and therefore, CCC lacks standing to sue on their behalf.[8] In support, MCC relies primarily upon *Health*

---

[6] This factor also distinguishes the case at bar from *Health Research Group v. Kennedy*, 82 F.R.D. 21 (D.D.C. 1979), and *Package Shop, Inc. v. Anheuser-Busch, Inc*., Civ. A. No. 83-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984), upon which MCC relies.

[7] Self-perpetuating board of directors refers to the situation where the organization's constituents do not vote to select the board of directors or officers of the corporation, but rather, the sitting board of directors elects both the officers and new board members of the organization. Coplan, 14 SE. ENVTL. L. J. at 49 (footnote omiteed).

[8] Generally, the term "member" "refer[s] to persons formally recognized as members of an organization as that organization is constituted under governing state law." Coplan, 14 SE. ENVTL. L. J. at 52 n. 26. Under the Pennsylvania Non-Profit Corporation Law in effect when this law suit was filed, "member" is defined as "[o]ne having membership rights in a corporation in accordance with the provisions of its bylaws." 15 PA. CONS. STAT. ANN. §5103(a) (West

*Research Group, Package Shop,* and *ALCOA, supra,* as well as *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012).[9]

CCC counters that while the existence of voting rights does demonstrate that members have the ability to control the governing board, voting rights are not required to confer associational standing, and argues that members may exert influence over their organizations and their activities in a variety of ways, depending on the nature of the organization. Here the members of CCC on whose behalf this litigation is being brought meet regularly with and advise CCC's executive director, and CCC is relying upon the testimony of standing witnesses to establish ongoing standing. Moreover, CCC argues that nothing in *Hunt* states that voting is a requirement, and this is especially true where the organization that is bringing suit is a traditional voluntary membership organization, unlike the growers association in *Hunt*. CCC cites the

---

1995). Subsequently, the definition of "member" was amended effective September 9, 2013 to define a "member" as a "person that has voting rights in a membership corporation." 15 PA. CONS. STAT. ANN. §5103(a) (West 2013). "Individuals identified for standing purposes by an organization who are not legally 'members' [are] referred to as . . . "constituents[.]" Coplan, 14 SE. ENVTL. L. J. at 52 n. 26. Based on the definition of "member" in effect when this lawsuit was filed, it appears that the Standing Witnesses would be considered "legal members" of CCC under the Pennsylvania Non-Profit Corporation Law.

[9] *Disability Advocates* is also distinguishable. The plaintiff organization in *Disability Advocates* was not a membership organization, but a private non-profit organization contracted to provide services to New York's protection and advocacy system for individuals with mental illness, as opposed to CCC which is clearly a membership organization. Unlike the constituents of other state P&A systems which were found to have possessed enough indicia of membership to satisfy the purposes of associational standing—"that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy'"—the constituents in *Disability Advocates* did not have a sufficiently active affiliation with the organization. 675 F.2d at 158 (quoting *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003)) (internal quotation marks omitted). As a contractor and not a P&A system, the organization, according to the court of appeals, did not provide its constituents with the requisite "indicia of membership" in the administration of the P&A system—a key factor distinguishing *Disability Advocates* from other cases in which the courts of appeals for the ninth and eleventh circuits found P&A systems to possess associational standing. 675 F.2d at 158 (citing *Or. Advocacy Ctr., supra*, and *Doe v. Stincer,* 175 F.3d 879 (11th Cir. 1999)).

journal article by Professor Coplan, in which he opines that "voting rights should not be essential to the assertion of associational standing." 14 SE. ENVTL. L. J. at 49. CCC submits that the Court should heed the exhortation in *Hunt* to not elevate form over substance here, which is what the Court would be doing if it found the absence of voting rights to be determinative of "membership" status.

The Court agrees with CCC that, just because the Standing Witnesses lacked voting rights when this lawsuit was commenced, that factor alone is not sufficient to defeat associational standing for Article III purposes. Nothing in *Hunt* indicates that the factors delineated there are the only factors to be considered. To so hold would indeed elevate form over substance. Rather, the purpose of the *Hunt* inquiry is to determine whether an organization provides its members with the means to "'express their collective views and protect their collective interests.'" *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F.Supp. 2d 663, 675 (E.D.La. 2010) (quoting *Hunt*, 432 U.S. at 345). Moreover, as Professor Coplan noted in his article, being able to dismiss the board of directors at the next election if the constituents are dissatisfied with the organization's representation of their interests is not the only way of ensuring the organization's responsiveness to the constituents' interests. *See* Coplan, 14 SE. ENVTL. L. J. at 54-55. According to Coplan, ensuring an organization's responsiveness to its constituents may also be accomplished through voluntary association with the organization, combined with substantial financing for the organization's activities. *Id.* at 76.

Professor Coplan opines that although the *Hunt* Court found voluntary association to be a non-essential factor, this factor should provide at least as much influence on the organization's management as board participation by members of the constituent group. *Id.* at 78. Coplan explains:

> [T]he affirmative action of an organization's constituents to affiliate with the organization in order to support its advocacy efforts, and to disaffiliate with the organization when they are dissatisfied with those efforts, may provide nearly as much practical influence on management as the bare right to vote for directors, especially where that right to vote is highly diluted by a large membership. . . . Most public interest organizations rely on the numbers of their membership both for fundraising and to assert their influence before government agencies; therefore, loss of membership numbers can cripple an organization's effectivesness. The ability of an organization's constituents to join or quit the group would appear to be a very effective means of ensuring the responsiveness of the organization's management—and also ensuring the "concrete adverseness" required for organizational standing.

*Id.* at 78-79 (footnotes omitted). Professor Coplan further posits that voluntary association takes on additional importance when combined with the ability to give or withhold funding for the organization. Professor Coplan opines that "[v]oluntary financing of an organization's activities, [as opposed to mandatory assessments from a particular industry as in *Hunt*,] might be the most effective means of ensuring responsiveness." *Id.* at 80. According to Coplan, "[m]any grass roots environmental organizations almost wholly depend on small contributions from individual constituents, regardless of whether the donor can vote. If those constituents are dissatisfied with the direction the organization is taking, or with its advocacy efforts, they may then 'vote with their pocketbooks' and cease financial support for the organization." *Id.* (footnote omitted). The Court finds Professor Coplan's comments instructive.

Here, twenty-six individual members of CCC, including the Standing Witnesses, have voluntarily affiliated with CCC for the specific purpose of filing this lawsuit,[10] and have

[10] It appears that the Standing Witnesses came to be members of CCC in the same way as CCC generally recruits individual members—individuals join CCC after learning about the organization, generally through community meetings, grassroots outreach events, or the website. Here, residents of LaBelle learned about CCC at a community meeting as one of three available

provided financial support in the form of annual dues of $10.00.[11] If the Standing Witnesses (and the other 26 individual members) chose to terminate their membership in CCC, that would in effect terminate this litigation as associational standing would then be lacking. In addition, CCC has provided its individual members, including the Standing Witnesses, with other means to express their collective views and protect their collective interests. Specifically, the Standing Witnesses and other CCC members in the community exert a significant influence over this litigation through: (1) regular and direct contact with CCC's executive director, Aimee Erickson (both in person and on conference and other calls); (2) regular attendance at monthly community meetings; and (3) participation in an advisory committee[12] formed to allow CCC to consult the community about this litigation between community meetings. Kulish Dep. at 100-101 (ECF No. 64-5); Byrd Dep. at 27-28 (ECF No. 64-4); Yma Smith Dep. at 70 (ECF No. 64-7); Pl.'s Resp. to Interrog. No. 48 (ECF No. 64-8); Decl. of Aimee Erickson at ¶¶1, 20-24 (ECF No. 64-1); Redman Dep. at 18 (ECF No. 60-11).

---

options that EIP and Public Justice presented to them for bringing a citizen enforcement action to clean up pollution at the Site. Thereafter, 26 residents of LaBelle, including the Standing Witnesses, voluntarily chose to affiliate themselves with CCC and became members by paying the annual membership fee and filling out the membership form. Marucci Dep. at 20-21, 24-27 (ECF No. 64-4); Kulish Dep. at 98 (ECF No. 64-5); Byrd Dep. at 27-28, 33 (ECF Nos. 64-4 & 66-2); Yma Smith Dep. at 70-71 (ECF No. 64-7); Decl. of Aimee Erickson at ¶¶22-23 (ECF No. 64.1).

[11] As of 6/30/14, CCC had 54 individual members. Decl. of Aimee Erickson at ¶11 (ECF No. 64-1). Approximately 10% of CCC's funding comes from individual member donations. *Id.* at ¶14.

[12] The Luzerne Township Concerned Citizens Committee is somewhat analogous to the advisory councils in *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003), and *Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999), which were comprised of individuals whose interests the organizations sought to protect and who were given the opportunity to comment on the priorities and activities of the organizations. As such, the courts of appeals found this constituted sufficient control despite the lack of voting rights.

The record also shows that (1) CCC met with the Standing Witnesses prior to filing the NOI and this action and obtained their approval to bring this action;[13] (2) CCC is guided by the communities it represents in its approach to litigation;[14] and (3) the 2007 Bylaws include a provision that allows five individual members to serve as at-large delegates on the Coordinating Committee upon nomination by a voting member organization and approval by a majority of the delegates on the Coordinating Committee,[15] and that since joining the CCC, each of the Standing Witnesses has been and remains eligible to serve on the Coordinating Committee.[16] Moreover, because CCC is a relatively small advocacy organization, the Standing Witnesses had and continue to have direct access to and communication with the executive director Aimee Erickson, they were and are consulted at every step of the way, and some of them serve on an advisory committee formed directly to influence CCC's actions in this litigation.[17] Therefore, their lack of voting rights does not equate to a lack of influence over CCC and this litigation. Decl. of Aimee Erickson at ¶20.

---

[13] Standing Witness Gary Kulish testified that he joined CCC so that this litigation could be brought. Kulish Dep. at 98 (ECF No. 64-5).

[14] Decl. of Aimee Erickson at ¶¶8, 24 (ECF No. 64-1); Erickson Dep. at 60-61 (ECF No. 66-1).

[15]MCC argues that while individual members are "eligible" to serve on the Coordinating Committee, none of the Standing Witnesses has been elected to serve. In addition, MCC argues that this "eligibility" is illusory as to the Standing Witnesses, because at-large delegates must first be nominated by a member organization and then elected by a majority vote of the board of directors at the first board meeting held in even-numbered years, and it is unclear whether any possess "qualifications and expertise deemed important to advance CCC's mission" to serve as an at-large delegate. Although MCC argues that the eligibility to serve as an at-large delegate is illusory, the right nonetheless exists, which is more than no voting rights at all, which was the case in the decisions where the courts found associational standing lacking.

[16] Decl. of Aimee Erickson at ¶16.

[17] *Id.* at ¶¶21, 24-26.

MCC further argues that the interests of the Standing Witnesses are not aligned with CCC's mission, and therefore, they are not true members. This argument actually touches upon the second prong of the *Hunt* associational standing test—that the interests sought to be protected are germane to the purpose of CCC. Contrary to MCC's argument, the twenty-six individual members, including the Standing Witnesses, share a common interest—the elimination of coal dust and other pollutants from the environment in which they live and work, caused by MCC's alleged violation of federal and state environmental laws in reclaiming the Site. The testimony of the Standing Witnesses quoted by MCC in its supporting brief does not show that the Standing Witnesses do not share common interests with CCC. Rather, the record shows that CCC and the Standing Witnesses seek the elimination of coal dust and other pollutants from the environment in which they live and work,[18] and this interest is germane to CCC's mission to inform, empower and work with communities affected by the mining, processing and use of coal.[19] Moreover, CCC's executive director has stated that where a community's position differs from that of CCC on an issue related to the litigation, CCC will take the position of the represented community for purposes of the litigation. Decl. of Aimee Erickson at ¶8. As the "threshold for the 'germaneness' requirement is quite low [and] . . . is satisfied by a 'mere pertinence' between litigation subject and an organization's purpose[,]" *Washington Legal Found. v. Leavitt*, 477 F.Supp. 2d 202, 212 (D.D.C. 2007), the Court has no trouble concluding that the germaneness requirement has been met here.

[18] Kulish Compl. to DEP (ECF No. 64-2); Citizen Compls. from Residents of LaBelle to DEP, 2006-2010 (ECF No. 64-3).

[19] Decl. of Aimee Erickson at ¶4.

MCC's final argument—that CCC and EIP manufactured members in order to have standing to bring this lawsuit—also lacks merit. There is simply nothing inappropriate with an organization engaging in a grassroots effort to recruit members who share common interests with the mission of the organization. In addition, it is clear that the Standing Witnesses have standing to sue in his or her own right, as the record shows that they have injuries-in-fact that are directly related to MCC's alleged violation of various federal and state environmental laws.[20] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183-84 (2000). Therefore, MCC's argument is unavailing.

Both sides have urged this Court not to elevate form over substance in reaching a decision on whether CCC possesses associational standing to bring this lawsuit. Based on the evidence and unique circumstances presented here, as well as a review of the case law, the Court concludes that it would be elevating form over substance to find that CCC lacks associational standing merely because none of the individual members served as at-large delegates to CCC, and therefore, lacked voting rights under the 2007 Bylaws. Unlike the constituents in *Disability Advocates*, the Standing Witnesses here do possess the means to influence the priorities and activities that CCC has undertaken, specifically, through this litigation, as there would be no lawsuit without the Standing Witnesses. Each of the Standing Witnesses testified at their depositions that they joined CCC so that the lawsuit could be filed. The record also shows that the Standing Witnesses knew that CCC was filing this lawsuit on their behalf. Some or all of the Standing Witnesses have participated on an ad hoc committee to advise CCC of the local community concerns and continued effects of MCC's reclamation activities on the local

[20] See Pl.'s Resp. to Interrog. No.14 (ECF No. 60-1).

residents. Thus, in a very real sense, the Standing Witnesses have influenced CCC's activities in filing and litigating this lawsuit.

## IV. CONCLUSION

It is questionable whether the "indicia of membership" test applies at all where, as here, the organization is clearly a volunteer membership organization, and the Standing Witnesses were "legal members" of CCC under the applicable Pennsylvania Non-Profit Corporation law at the commencement of this action. Moreover, although only individual members lacked voting rights at the time the suit was filed, subsequently, the bylaws were amended and established voting rights for all members. Therefore, CCC could voluntarily dismiss this action and simply file a new civil action on behalf of the same individual members who now have voting rights. However, this would cause unnecessary delay and waste of the Court's and Parties' time and resources because the record here shows that alternative means of assuring responsiveness and "concrete adverseness" exist which provide sufficient indicia of membership in the absence of voting rights. Therefore, the Court finds that CCC has associational standing to bring this lawsuit on behalf of the twenty-six individual members described in the Amended Complaint. Accordingly, the Court will deny MCC's motion to dismiss for lack of standing (ECF No. 59). A separate order will follow.

Dated: August 22, 2014

BY THE COURT:

______________________________
LISA PUPO LENIHAN
Chief U.S. Magistrate Judge.